Our first case for argument this morning is 21-1460, Potter v. DVA. Mr. Petrie, Petrie, how do I say your name? Petrie. Please proceed. Good morning. May it please the court. It is of the petitioner's opinion that this appellate review comes down to a simple and straightforward question. Has this court ever held that a government agency has met the clear and convincing evidence standard in the whistleblower retaliation case when relying on facts such as those presented in this case that amount to such a weak evidentiary showing? I believe it's extremely safe to say this court has not. I convey that confidence because I could not find one case that was held that the clear and convincing evidence burden was met. Presumably. Counsel, on that point, part of the conclusion here, and I think in many of these cases, is the credibility determined by determination by the administrative judge. So doesn't that go a long way towards getting to the clear and convincing in every case? Because if, do you agree that if what Mr. Deering said was true, i.e., the judge believed everything he said, that that would be insufficient? Is your argument that he wasn't being truthful? Is your argument that even taking his testimony as gospel, you still don't get there? Yes, Your Honor, because as CARB, the Social Security Administration lays out, there are three factors that the agency's evidence. We believe that Dr. Deering's testimony is only one piece of evidence. And we're not asking this court to reweigh the evidence or make a credibility determination. We're simply asking the court to assess if the substantial evidence supports a finding that the government clearly and convincing proved independent causation in this case. Can I ask you, and this is a factual question, and maybe I should know this, but it's Friday, so I've forgotten if I knew it at all. The vacancy announcement was posted for like three months. And not that you have the burden here. Clearly, the burden is on the government with the others. But is there anything in the record that demonstrates that Mr. Deering, that something happened with respect to the whistleblower's disclosures, some effect, something that occurred with that three months? Because he did, the position was advertised. I think they kind of knew she'd apply. They probably had her in mind. And then, so what about that? Is it a three-month period that it was posted before it was taken up? It was a four-month period. It was posted on August 10th. Okay. So did anything happen? Did Mr. Deering become aware of anything during that period that he hadn't known before related to her disclosure and the impact of her disclosure? I recognize that's not the exact issue here. It's the burden. I'm sorry, go ahead. No, but my question is now. I think, wasn't it more like two-and-a-half months, August to November 1st? August 10th, and he canceled it on November 1st, 2015. So that'd be... August, September, October, November, about three months. Well, two-and-a-half, right? Okay, yes. Okay. So yes, there were several incidents that occurred between the posting of the chief nurse ward position and the cancellation. As you are aware, the Phoenix VA scandal began to become public. Dr. Deering had to testify before Congress in September of that year, I believe. There were other incidents in which VA management as a whole approached Ms. Potter about her disclosures, about whistleblowing in general, and stated that they wished that that information would remain in-house and not go outside of the There was incidents that occurred prior to the August 10th posting and then after the August 10th posting, between that time and November. And then again, in September, Ms. Potter informed Dr. Deering that she would no longer be willing to act in the chief nurse ward position without an official detail. So that stopped the ability for the agency to allow her to do the work without actually giving her the title. And that's what we believe actually sparked the November 1st email stating that he was not going to post the actual position or fulfill the position. And am I right in remembering from a factual standpoint that between the posting and the taking down a little later in August of 2015, Ms. Tademy testified that she informed Director Grippen about the fact that Ms. Potter had made an EEO complaint with all of the same information that was the subject of the whistleblower complaint. That's correct. So after the posting, the director of the agency, Mr. Deering's boss, was informed about the Ms. Potter's complaint to EEO on the same subject matter as the whistleblower issue. Correct, but subject matter except the fact that the whistleblower retaliation dealt with the actual June and July incidents in regards to the care that was not being presented to the community. The EEO complaints had other factors that were separate and apart, but yes, Ms. Potter did inform the agency of all her whistleblower as well as her EEO activity during that time period. One follow-up question. Ms. Tademy informed Mr. Grippen about the EEO complaint and didn't Mr. Deering testify that the entire selection process was actually a team for this position, which included himself and the director, Mr. Grippen? I believe he did testify to that, but Mr. Grippen testified that once he approved the position, he had no further activity to do with it. He said that once he had approved it, it was Dr. Deering's prerogatives on what he was going to do with that. What's the relief that's being sought here? Yes, so I'm very happy that you asked that question. So, if this court agrees that the DBA failed to meet the clear and convincing evidence burden, Deborah A. Bagnullio, the Department of Interior, is directly analogous to the question. This was also a whistleblower retaliation non-selection case where the appellant applied for a position. However, it was filled with another applicant and she alleged non-selection was due to her whistleblower disclosures. The board held that the government did not meet their clear and convincing evidence burden. Thus, appropriate corrective action included retroactive promotion with back pay as well as awards of consequential damages, attorney's fees, and costs, citing Harris v. Department of Agriculture, where the board stated where a law requires a promotion or where facts establish a clear entitlement to a retroactive promotion, the appellant is entitled to the promotion retroactively. Then they also cited 5 U.S.C. 1221-G. So, let me ask you how that works as a practical matter. Obviously, she's been working since then, I hope, and probably been very successful because it seems that she's a really good nurse. So, all of that offsets whatever it would have been. But then, your view is that she might be entitled to monetary compensation if there was a difference between the amounts during that period. And then, does she want the job back? No. She would want the difference in back pay between the chief nurse or physician until the period of time, because she has a duty to mitigate. So, due to the period of time in which she began to make more in salary than the chief nurse would have paid, then obviously she wants attorney's fees and compensatory damages. But she's not seeking the position? No. So, we believe that, again, that the evidence in the record establishes that there was a lack of substantial evidence in this case. We believe, I think we've spoken about Card Factor 1 and the reasoning that Dr. Dearing gave was weak. So, let's discuss Card Factor 2. The facts in this case are analogous to those in Whitmore, where the evidence reflects that VA management were closely following a petitioner's whistleblower disclosures and the effect they were having on compelling the Phoenix VA to remedy the problems disclosed. This court found, when a whistleblower makes such highly critical accusations of the agency's conduct, an agency official merely being outside the whistleblower's chain of command, not directly involved in the alleged retaliatory actions, and not personally named in the whistleblower disclosure, is insufficient to remove the possibility of retaliatory motive or retaliatory influence on the whistleblower's treatment. However, there's a difference in this case. Dr. Smith was directly involved in the DVA's retaliatory actions by rushing the recruitment of the chief nurse physician in 2017 after learning of Ms. Potter's resignation and pending transfer. I'm sorry to interrupt, but time is running out. I'm clearing convincing evidence, and I'm looking at AJ's opinion here, 12 and 13, where he outlines Dr. Dearing's testimony. How would you characterize it? Is it your view that even if you believe everything he said, it's not enough? It doesn't really get you there? Or is it that he doesn't have any corroboration? He's just kind of saying this stuff, and the AJ is saying, well, I understand you don't remember a lot of details because it was a long time ago. What's your theory? Well, that was this court's theory in Miller, in Troy V. Miller v. Department of Justice. This court stated that they did not believe the, I believe his name was, Mr. Miller's supervisor. They did not believe his testimony. They said, we believed his testimony. We're not questioning his credibility. We just believe that there wasn't enough. So that's your view. I asked you a mixed up question with 14 parts. Yes, our view is that there was not substantial evidence. When you take the Carr fact, when you look at the evidence in the aggregate, there's more than enough evidence that detracts from- Well, there could have been corroboration. I mean, if there had been corroboration, you'd be in trouble, right? If there were memos to the file written between him and the personnel people saying, this is a problem, we've got to pull this. But there's no evidence that I don't think there's much documentation. There is no documentation. But the court in Miller stated that corroboration wasn't absolutely necessary. Well, the email that I think Dr. Dearing sent around the time that the position was pulled is supportive, is it not, of his position? It's one piece of evidence. And then his testimony- Well, it's consistent with his position that it was the dispute over the organizational problem. Correct. However, there is much evidence in the record that detracts from that reasoning that we believe is equally as important. And if there are no more questions at this time, I'd like to reserve the rest of my time for rebuttal. Yes, Mr. Petrie, no problem. Mr. Burr, you have the email. Good morning, Your Honor. May it please the court. This court should affirm the decision of the MSPB because substantial evidence supports the conclusion of the administrative judge that the Dr. Dearing of the VA would have canceled the chief nurse floor vacancy in Substantial evidence under Factor I of the Carr test, that being what the agency found to heavily weigh in the agency's favor, the reasons for the cancellation decision, is supported by substantial evidence. Dr. Dearing sent a contemporaneous email in November 2015 directing HR to cancel the chief nurse floor vacancy at that time and stating, as Judge to discern and confirm how that position was going to report within the agency and also restructuring within the agency was going on and that presented obstacles to filling the position at that time. Is there anything in the record that indicates that this, that seemed to have, that same situation seemed to have existed before they posted it? Is there anything that changed? I mean, the stuff about having to organize the bureaucracy and all this reorganization going on, that was in existence at the time they posted the position or was there a change? I don't remember what the record said. Yes, Your Honor. The issue of reorganizing this administrative medicine service at the Phoenix VA had existed for a while and it in part was spurred by the patient access crisis. So that wouldn't have been a reason for withdrawing the vacancy announcement because that existed before they posted it? And yes, Your Honor, that may be the case, but in this, in the record in this case does establish that the problems, although they persisted, they existed before classification and approval of this vacancy, they persisted after and through the vacancy announcement being advertised. And Dr. Dearing testified to that at Appendix 621 to 622. Additionally, there's consistent testimony in the record from Mr. Griffin, the medical center director at the time, saying that he was attempting to implement a new leadership structure that presented obstacles to fulfilling or filling this chief nurse floor vacancy. Additionally, you have testimony My question goes to, was there any change in circumstances between the time they posted it and the time that withdrew it regarding the reasons that they said they withdrew it? There was no change in the reasoning, Your Honor. So isn't that a problem? No, Your Honor. They just hadn't thought about it before, so they go ahead and put up the posting and then they think about it and they think about, oh, there were all these reasons we shouldn't do it, so they pull it down. Is that what happened? Your Honor, there is evidence in the record establishing that the agency was attempting to fulfill this position because it was a critical position within the organization and the agency thought it best to move forward with posting this position, apparently, but in the end needed to pull it back because Dr. Dearing, in his email to HR and consistent about who this was going to report to and how it was going to be organized. As I understand it, Mr. Griffin testified that he had previously used the dyad structure in Milwaukee and he was in favor of using it in Phoenix, but correct me if I don't have his testimony exactly right, but the gist of his testimony seemed to me that there was And that was the gist of the problem. Is that a fair characterization? Well, go ahead. That is a fair characterization of Mr. Griffin's concerns. Mr. Griffin's testimony that is consistent with Dr. Dearing's testimony about the concerns of organizing and determining who this position was going to be reporting to because, as Judge Bryson mentioned, there was pushback on implementing this dyad model, which would contemplate a coequal nurse and nurse organization chart, and as Your Honor mentioned, there were doctors, traditionally nurses report to doctors, and they were attempting to make them coequals in the case. And to follow up on Judge Post's question, was there anything to indicate the timing of the pushback from the doctors? Anything in Mr. Griffin's testimony in particular? Because I don't recall. Your Honor, there's testimony indicating that the pushback was continuous and it was going on around the time of the vacancy, going through classification and approval, through advertisement, and even through Where does Dr. Dearing testify to that? Will you please draw my attention to it? Dr. Dearing testifies to the dyad model being controversial at 621 to 622 in the appendix. Is this consistent with Dr. – sorry, Your Honor. Mr. Griffin testifies to this being controversial at appendix 520 to 521. Dr. Griffin testifies to it where? Mr. Griffin testifies to it at – I'm sorry, I meant Dr. Dearing. Dr. Dearing is the selecting official. Correct. So where does Dr. Dearing testify to it? Dr. Dearing testifies to these problems persisting at 621 to 622 of the appendix. So the evidence, the substantial evidence in the record about the reasoning for the cancellation is this contemporaneous email. Then we have the consistent corroborating testimony of Dr. Dearing having sought earnestly but unsuccessfully to obtain agreement on how this position was going to be structured and who it was going to report to. Aren't you a bit overstating what the ALJ found? I mean, didn't the ALJ actually find that Dr. Dearing's recollections were admittedly less than certain? No, Your Honor. I'm reading the ALJ's report. The administrative judge did find that Dr. Dearing's testimony was admittedly less than certain as it may once have been. However, the administrative judge found the contemporaneous November 2015 email directing HR to cancel the vacancy to be consistent with his testimony. Additionally, Dr. Dearing's testimony was consistent both internally and when compared to the testimony of Mr. Griffin. When you say it was internally consistent, that doesn't seem like my recollection of having read it. Didn't he express uncertainty at least at one point early in his testimony about why he pulled back the position in November? Dr. Dearing expressed truthfully in just one testimony that he did not fully remember all of the circumstances around that. Where did I find that in this record? That's actually, that is summarized in the ALJ's… No, I want to know, okay, what page is the testimony? This is at Appendix 12 and 13 of the ALJ's opinion where he summarizes. Where is the testimony? Appendix 559 to 562. The email string that is referenced at the bottom of Appendix 621, do we have that entire string in the record? Email thing. I'm sorry, Your Honor, which appendix? Right at the bottom of 621. Answer, it's in the email string. This is Dr. Dearing testifying. There was a discussion amongst leadership and nurse exec, director, etc. I'm just curious as to whether that is in the record. Or is it part of the email string that led to the November 1 email canceling the posting? That is in the record, but I'm wondering if this is a separate email string or part of the same. I believe this is part of the same email string that led Dr. Dearing to email HR to direct the cancellation of the vacancy. Once again, just so I don't have to thump through the appendix, where is that email string in the appendix? I don't have it written down. The email canceling the vacancy is at Appendix 806. Okay, well that email string is not what I understood he was referring to, because that was between November 1 and November 4, and therefore was after the decision was made. There is his email saying, we need to have more discussion about the best way to structure this service, whether the nurse board should report, etc., etc., before we move toward a selection. What I'm asking, is there anything, any email string before November 1 that would be consistent with Dr. Dearing's, or inconsistent with Dr. Dearing's, finished testimony? Because I don't recall anybody citing it, but he does make a reference to the email string, and I thought it might be in there. And I do not see an email in the appendix before that. Okay, can you turn to 559, please, in the appendix? This is the questioning of Dr. Dearing. The question, do you recall what led you to cancel the recruitment, the non-selection? Answer, I don't recall what precipitated this. I just know that we had lots of discussions around, as a leadership team, about how this should be structured, how it should be ran as a service, whether we get approval from But I know that there, we decided before we move forward, we need to have some discussion about the reporting. How is that clear and convincing evidence that it was pulled back for a reason not related to her disclosures? Well, Your Honor, this testimony is read in light of the November 2015 contemporaneous emails stating the same reasons around, concerns around restructuring and figuring out who it was going to report to, and there being consistent testimony as well from Dr. Venditti and Mr. Griffin. What November 15th emails are you talking about? The November 1st, 2015 email, actually. Oh, just that one email pulling it back? Directing the cancellation, yes. But that isn't the email that contains all this detail about the structure and the reporting? Correct. So, what is the clear and convincing evidence? It's that email on page 806? And as well as the corroborating testimony of Dr. Deering. Dr. Deering, who says, I don't recall what precipitated this? You mean Mr. Griffin? Griffin is what you said earlier. Dr. Deering testified here about his recollection, which admittedly the administrative judge found and weighed the testimony to find that it was admittedly less than certain. But I was confused. Were you saying that the corroborating evidence, or some of it, comes from Mr. Griffin or Dr. Deering? So, corroborating evidence comes from Dr. Deering, and additionally there's consistent corroborating evidence from Mr. Griffin and Dr. Venditti, who was Ms. Potter's supervisor at the time. And what did Dr. Venditti say about this issue? Dr. Venditti testified that the agency in moving forward with a chief nurse for vacancy announcement was attempting to recognize Ms. Potter in her work before the organization and it was a positive thing. But at the same time, Dr. Venditti recognized that there had been substantial pushback on putting, implementing this position within the organization. And that is consistent with Dr. Deering's ultimate email in November 2015. Do you happen to have the pages where Dr. Venditti testified to that effect? Dr. Venditti is testifying to this at Appendix 422, as well as Appendix 452 to 53. Mr. Griffin is also testifying to the controversial nature of implementing the DIAB model. At Appendix 500 to 501 and Appendix 520 to 521. Okay, I'm on page 422. Why don't you show me where Dr. Venditti is saying that we pulled it back because we weren't sure of the reporting requirements. Dr. Venditti is not saying anything about them having pulled it back because testimony establishes that Dr. Venditti was not at the VA at the time, but rather her testimony is about what was going on at the organization with needing to determine who these positions were going to report to, restructuring all of these structures. Okay, we're on page 422. Does it talk about that? That's what you referred me to, 422. 422 to 423. Okay. This is talking about the change in the organization chart in December 2014, which had been to at Lyons, well it's actually the whole page, 422 down to 423. Okay, so this is about the change in the organization chart. Attempting to get Ms. Potter recognition in light of the structural obstacles they had encountered to actually filling a Chief Nurse 4 vacancy within this organization, which is consistent with Dr. Deering's reasoning for canceling it. But all of this is about an organization chart in December of 2014, which happened after the protected disclosure in this case. But the job wasn't posted until August of 2015, which kind of goes back to what Judge Gross was asking you at the beginning. How in the world does this testimony about the organizational chart in 2014 support that they pulled back a job they posted in August of 2015, in November of 2015? This organization chart in December 2014 testimony establishes was improving Ms. Potter's title within the organization to be a Chief Nurse Manager, which is akin to a Chief Nurse 4, that is a Chief Nurse Manager in colloquial terms, and that was therefore improving her position within the organization. Right, but that doesn't really have anything to do with the dispute, apparently, among the staff about who the Chief Nurse would report to, the dyad structure, right? That's a different issue altogether, or at least it seems distinct. That's an issue in the background, Your Honor, with the impediments to implementing this position in part had to do with who it was going to report to. That was undetermined at the time. But on the timing point here with December 2014 organizational chart, improving her stature or her position title was that that happened after the protected disclosure that is at issue at this point in the appeal. And by improving, signing off on improving her title within the organization, that is antithetical to having a retaliatory motive toward Ms. Potter for having made— Well, I mean, the protected disclosure was the November 2014 email chain in which she and the concerns— That was July 2014, Your Honor. I'm sorry? That was July 2014. Right, okay, I got the date wrong, but thank you. That's what that disclosure was about. But then I guess my biggest problem with the ALJ's opinion in this case is actually relevant to CAR Factor 2. The retaliatory motive, whether or not—and he has analyzed whether the government had any retaliatory motive, and he concludes that Deering had a slight motive to retaliate. And what bothers me is that what was introduced in front of him and discussed in detail is evidence that after her disclosure, there then came this OIG investigation, which became, as Mr. Deering referred to it, a media circus that was a complete crisis. The breadth of its impact, he said, could not be understated. That's what he said. It was of enormous proportion. He said he was receiving death threats, had to testify before Congress, who asked him how could he still have his job with all of these things going wrong. So what we have is a picture painted by Mr. Deering himself of an absolute, complete, and utter crisis as a direct result of the things that she reported in her November email to him, which were subsequently also reported and became part of the IG and OIG investigation, which just—there can be no dispute, it blew the whole place to bits. It really did. It blew this Phoenix place. Vendetti was kicked out. Deering was kicked out. Eventually, everyone in the leadership chain was removed as a direct result of the things that she reported. Not a single word of that is discussed in CAR Factor 2, which is supposed to be going to whether there was any evidence that this individual had any retaliatory motive. How is it possible? How could that not be discussed? Isn't this case at least a vacating remand for the ALJ to discuss all of that? Because that evidence is overwhelming, and it's not mentioned in his opinion, even though a portion of the opinion is supposed to be go to, did Deering or did he not have any motive to possibly want to retaliate in light of these disclosures? What do we do with the complete absence of discussion of all of that evidence? Well, Your Honor, in the AJ's 2018 decision, which this court affirmed in early 2020, he does go into a substantial discussion of all of the different evidence that Ms. Potter contends now detracts from the reasoning for the cancellation decision. He does dispose of that when he disposes of, the administrative judge disposes of the claim for reprisal around the January 2017 unclassified duties reassignment. Yes, but that opinion was reversed by us and sent back because he failed to understand that Deering had notice of all of this. Remember, he said that Deering wasn't even aware of it when, in fact, it was clear he was. So that opinion, we then said, no, a prima facie case has been established. So that's what he found later in light of going back and realizing there was timing and knowledge. So once you get beyond a prima facie case, now we're at, has the government established clear and convincing evidence? And one of the factors that is required, only three, and factor number three is irrelevant. So there's only two factors here. And factor number two is, was there any retaliatory motive that could be ascribed to the actor? Why is none of that worth considering or discussing? Are you saying that evidence is all irrelevant, that the ALJ didn't consider it or shouldn't have considered it? A couple of points. First, this court's president establishes that the ALJ has reviewed the record regardless of what is actually mentioned in the opinion. And additionally, the portion of the 2018 decision that this court reversed regarded only this November 2015 non-selection. The portion of that opinion regarding the January 2017 unclassified duties detail, wherein the administrative judge discussed all of these different pieces of evidence that Ms. Potter, in this part of the appeal, continues to allege detract from the reasons for cancellation, that portion of the ALJ's decision was affirmed by this court as being supported by substantial evidence. I still don't understand. Unless I'm confused, the government has to prove by clear and convincing evidence that they would have taken this action regardless of her disclosure. Are you saying all the things that flowed from her disclosure, all the problems it caused for the selecting official himself, he described death threats, couldn't leave the house, crisis, and ultimately he was fired. You're saying all of the problems that she says flowed from her disclosure are not relevant to assessing whether he had a retaliatory motive? No, Your Honor. I'm not saying they're not relevant considerations. I am saying, though, the ALJ has passed upon them and this court has affirmed the consideration of that. Has passed upon them in what way? In the 2018 decision. In what context? In the context of the January 2017 unclassified duties detail, the administrative judge assessed the retaliatory motive with regard to each of those facts. And was that Deering that was the prime mover and shaker on that one? Your Honor, he was involved, but I do not believe he was. Don't you think that makes a difference? I mean, we demanded it because this key alleged retaliatory action, the ALJ got completely wrong and didn't identify the individual who was responsible for that as being someone who knew about the disclosure. So knowing about, this is a first, right? We didn't review that. We didn't have anything like that in the first case on which we could opine a review or which the AJ could opine about the retaliatory motive that Mr. Deering would have had since he found that Mr. Deering didn't even know about the disclosure. Maybe my recollection is foggy about 2018, about our earlier opinion, but what am I missing? And here, Your Honor, going back to the decision that is currently before the court, the administrative judge analyzes the motive of Dr. Deering and assesses the testimony and the documentary evidence around that and notes particularly that . . . Do you want to tell us what page you're looking at in the AJ's opinion? His analysis of this doctor. Just a moment. This is appendix, page 15 and on the 16th of the opinion. Okay. And there, he notes that there conceptually could have been a retaliatory motive on the behalf of Dr. Deering because the July 2014 disclosure, although it did not specifically name Dr. Deering or anybody for that matter, reflected poorly on his management and cost him to have to decide how to respond to that. However, the administrative judge found rightly that he was then required to assess any evidence in the record that . . . Okay. So time out. This is what the ALJ said. Deering had ostensibly motive to retaliate for her disclosure because the problems she raised tended to reflect unfavorably on Deering's management and put Deering in a place of either choosing between working to address her concerns or doing nothing and fearing further consequences. What he doesn't discuss is that after that time and before Deering pulled back the selection that he knew she had applied for, he had to testify before Congress, had death threats, was asked how he could possibly be in his job given what they perceived to be his complete incompetence in the handling of the very things she reported. I feel like possibly that sounds like an important amount of stuff that might cause somebody to have retaliatory motive. I'm not saying Deering did. I'm not saying he's a bad guy. But it was argued strongly before the ALJ and not a word of it is mentioned in this opinion. Not a word. Not mentioned. Now, there's one thing to say. We have to presume the ALJ considered everything. But this stuff seems important and it was argued and it isn't mentioned. And I don't know how, if I'm supposed . . . Am I to review this determination about retaliatory motive for substantial evidence? Is that what I'm . . . I assume it's got to be a fattened question. Yes. So I'm supposed to review it for substantial evidence. Am I supposed to look at it and say, did the government prove this by clear and convincing evidence? You're supposed to decide whether the CAR Factor II analysis is supported by substantial evidence as part of the balancing test for determining whether there's clear and convincing evidence. So how can I conclude that this CAR Factor II analysis is supported by substantial evidence when it doesn't discuss the unbelievably overwhelming set of circumstances this man was subjected to by virtue of her disclosures? Your Honor, as we make clear in our brief, there's nothing tying Ms. Potter to any of the possible negative actions taken against Dr. Deering. For example, there's nothing tying Ms. Potter's disclosure to Dr. Deering being called to testify before Congress in September 2014. Were there other sources of information that led to this blowup and explosion at the Phoenix Center? Yes, Your Honor. The record makes clear that more employees at the Phoenix VA than not were disclosing activities and problems to the OIG. But Dr. Deering also testified that he was certain Ms. Potter would have talked to OIG because some of these things were in her area, like urology, and OIG was talking to everyone. Ms. Potter may have – Not may have. Mr. Deering said that he was sure she had spoken to OIG because everyone had spoken to OIG. In fairness, that they were talking to so many people, he was sure that a lot of what they were investigating were right in the area of the things she had reported to him, so she would have been within the group of people who OIG was speaking to, right? Correct, but it's then fairly, I guess, attenuated what her impact was on him being called to testify before Congress in September 2014. In any event, as the administrative judge recognized in 2018, and the record makes clear, Dr. Deering, even after that testimony before Congress where he talked about all of these negative consequences of what was going on at the Phoenix VA with the OIG investigations, he signed that December 2014 organization chart, improving her position in the organization. He gave her a title but no pay. He did not. The agency did not. Is that correct? He gave her a title but no pay. Correct. However, Ms. Potter recognizes in briefing before this court at Petitioner's Brief 25 that that was something that she preferred. Indeed, Ms. Potter made a whistleblower claim about a change back from that title before this court. I asked your friend this on the other side, which is they decided to advertise the position and then what we debated six weeks or two months or whatever later, they pulled it. Is there anything in the record there that would indicate that there was more bad stuff happening to Mr. Deering that could be arguably attributable to something that the whistleblower had said and done? In between the time that the position was advertised and the position was pulled. Between August 10th and November 1st. Correct. So there is a… A622 should help you. As a recollection. I think Mr. Deering testifies there that the OIG investigation was ongoing during that time and there was a lot of discussion about these whistleblower reports. I think that's actually a quote. Lots of discussion about the whistleblower reports. And he does discuss, he does testify that there was discussion about the whistleblower reports. However, the administrative judge in 2018 specifically weighed that testimony and found it to not have a lot of weight because it's in response to a leading question. And this court approved that in affirming that portion of the decision. Additionally… But you understand, I mean, I guess what the Chief has been referring to is this retaliatory motive which spans less than a page in the AJ's report. And you keep talking about our 2018 opinion. But the reason for the remand entirely was because the AJ, when he reviewed this whole case in 2018, did not appreciate or understand that Mr. Deering even knew about the disclosure. Or am I misremembering? That Mr. Deering, Dr. Deering did not know about the July 2014 disclosure. So Judge, do you think that's something that's worth a talk or worth a look? I mean, if now part of the remand, understandably they have to show an alternative basis with clear and convincing evidence. But as the Chief pointed out, one of the core factors is retaliatory motive. So wouldn't your expectation have been that he talked about, even concluding that it was minimal, de minimis, that he should have talked about what it was? Because the other report, our 2018 record couldn't have done that because we found that he didn't know what we, the AJ concluded he didn't know about it. No, Your Honor, I do not believe the AJ was required to go through all of the different pieces of evidence that have no tie to, no causal relation between anything that Ms. Potter did that is at issue at this point in the appeal. The only disclosure at issue at this point in the appeal is the July 2014 disclosure about delayed treatment for psychotherapy patients. OIG complaints, other EEO activity. None of that is the protected action at issue in this point in the appeal. It may not be the protected action, but isn't it relevant? Isn't everything that happened before November 1st, 2015 at least relevant? That is to say, if all sorts of consequences were ongoing, can't those be tied back to the original disclosure at least plausibly, or possibly, in terms of relevance of all that evidence? Never mind that those other things might not be precipitating actions for an independent miscellaneous determination, but relevant to this one. Yes, in a broad sense, they're relevant. They were all happening around the same time, but still, there's nothing in the record tying these actions to Dr. Deering and negative consequences that Dr. Deering may have experienced. Just for the court's summary, to conclude on the EEO point, the claim about there being discussions in September 2015 with Ms. Tadamy about EEO complaints, those were to Mr. Griffin. Those discussions were with Mr. Griffin, and Mr. Griffin, as counsel opposite recognizes, is not the person who made the ultimate decision to cancel this vacancy. That person's motive is not at issue here. Dr. Deering's motive is at issue here, and the record establishes that he did not have a retaliatory motive in doing so, but rather he simply thought that the agency needed to restructure the service and figure out who this position was going to report to. Can I just get some clarification on what you said? Take the EEO thing off the table, because I think your friend on the other side also discouraged the weight you would give to that. But you don't think what she told the IG and what Mr. Deering knew or didn't know about what the current disclosures were to the IG has any bearing on this whistleblower issue? Do you think we're confined to just what happened July 10th, 2014? Yes, Your Honor. The remand order in 2020 was for the administrative judge to consider the impact of this July 10th, 2014 protected disclosure. Not OIG activity, not EEO activity, not any other protected activity. Rather, we are confined to that one disclosure on July 10th, 2014. And then we're also confined on the personnel action to the November 2015 cancellation, which excludes a consideration of what happened in March 2017, when the agency then, after Dr. Deering had left the agency and had been gone for a while, sought to repost the vacancy. There's a mentioning of Dr. Smith in reposting the vacancy in March 2017, and that somehow being in reprisal for what Ms. Potter had done before. However, as the administrative judge recognized in 2018, and in the portion of the decision that this court affirmed, Ms. Potter did not adduce any evidence before the board that Dr. Smith, the person who was in charge of reposting in March 2017, had any knowledge of any of Ms. Potter's protected disclosures. Okay, Mr. Byrd, I think that we've kept you up here long enough. Why don't we hear from Mr. Peter? But I want to say, Mr. Byrd, I very much appreciate your mastery of the record in this case. It was exceptional. Thank you. Mr. Petrie, please proceed. You have some rebuttal time. And because we let Mr. Byrd go just a tiny bit over, if you have to go a tiny bit over also, it's okay. Thank you, Your Honor. Thank you, Your Honor. Just to start, there is no evidence in the record that other than Ms. Potter's disclosures where any other employee provided disclosures to the OIG. But what do you have to say then about the last point we were discussing with your friend, which is that the remand was limited to the disclosure of July 14, 2014, if I got my date right. So that was not the IG stuff. And if you use that as the date, then it's fair, is it not, to look at what he did with respect to the organization chart and everything after that? Well, no, because the July 10th disclosure was the contributing factor that led to the burden-shifting framework. And once the burden shifts to the government, then all evidence in the aggregate must be reviewed. So after July 10, 2014, then anything that occurs that's pertinent to the non-selection, which would be the 2017 recruitment, should be considered by the court. This court stated in Whitmore that evidence only clearly and convincingly supports a conclusion when it does so in the aggregate, considering all the pertinent evidence in the record, and despite the evidence, that fairly detracts from that conclusion. The DVA would like this court not to consider the 2017 rush recruitment of the chief nurse physician. However, there is no precedent which states that the review of independent causation ceases after the personnel action is taken. Well, Dr. Terry was long gone by that time. And clearly, when your client moved to California, there was a real gap. I mean, nobody is disputing that she played a major role. They needed to fill a position. She was leaving right in 2017. So I'm not sure how much traction you get out of that 2017 piece of it. Well, here's the traction, Your Honor. So the agency would like to argue that there were other factors such as leadership turnover that delayed in the hiring of the chief nurse for physicians from November 2015 to March 17. But we're only looking at Dr. Deering. I'm sorry to interrupt you. But we're only looking at Dr. Deering. That's the substance of the remand. But Whitmore, the Whitmore court determined that VA management as a whole should be determined when you're looking at CAR Factor 2. The Whitmore court said, when a whistleblower makes such highly critical accusations of an agency's conduct, this court, an agency official merely being outside of that whistleblower's chain of command, not directly involved in alleged retaliatory actions, and not personally named in the whistleblower's disclosure is insufficient to remove the possibility of retaliatory motive or retaliatory influence on the whistleblower's treatment. Yes, but our remand was limited to Dr. Deering, was it not? No, Your Honor. Your remand was limited to the July 10th disclosure, which shifted the burden to the government, which then brought the CAR Factor into play. So now CAR Factor 2 states that you must take into consideration VA management. Well, Whitmore states that you must take into consideration VA management as a whole. And in this case, VA management was Dr. Smith. And Dr. Smith was directly involved in a DVA retaliatory action by rushing the re-recruitment of the chief nurse corps physician. This also goes to CAR Factor 1, and I'll explain how it deflects or detracts from the agency's reasoning and the judge's decision on why CAR Factor 1 strongly was in favor of the agency. If you'll allow me, when the chief nurse physician was advertised on August 10th, 2015, it was based on the reporting structure that had already been approved in two organizational charts approved by the agency. All upper management, including Interim Director Mr. Griffin and Chief of Staff Dr. Deering, approved both organizational charts and the initiation of the recruitment. Post-March 19, 2015, all positions within Administrative Medicine Services followed the reporting structure of the two approved organizational charts. The organizational structure of Administrative Medicine Services remained intact from the approved org chart on March 19, 2015 until August 2017 when it was changed to community managed care. According to the facts in the record, the chief nurse physician that was advertised and re-recruited in March 2017 after the petitioner's resignation was done so under the same organizational structure Dr. Deering had previously stated needed more discussion for the best way to structure the service. So as you can see, there was no change in structure of the service that led to the re-recruitment of the chief nurse physician in 2017. Did they use the dyad structure? Absolutely, yes. Yes, Judge, they did. The only change was that the petitioner would no longer be a candidate for the position because she had informed the DBA of her intent on resigning and impending transfer. So clearly, this is particularly important when considering the March 27 rush recruitment of the chief nurse physician. Remember, this position was recruited the day, the day they found out that she was resigning. They didn't wait a week. They didn't wait a month. They did it the same day. The DBA would like this court to disregard those events because they occurred after the November 2015 cancellation. Like I said, however, there's no precedence which states the review of independent causation ceases after the personnel action is taken. In fact, it would be consistent in the finding in Whitmore, which I've already stated. Now let's talk about CAR Factor 3 because I think that this is something that the administrative judge and the DBA both misapplied. It's very important to note that this court has never found that one factor was more important than any other factor. So simply relying on just one factor for which the AJ found weight, the way strongly AJ's in the favor, but which we forcefully dispute, doesn't automatically get them over the high burden of proof. They have to review all three factors. So when considering CAR Factor 3, the DBA conveniently points to the section of Whitmore where this court states, CAR does not impose an affirmative burden on the agency to produce evidence with respect to each and every one of the three CAR factors and that the absence of any evidence relating to CAR Factor 3 can effectively remove it from the analysis. However, they fail to recognize the very next paragraph, which is even more important, which states, to the extent such evidence exists, the agency is required to come forward with all reasonable burden evidence relating to CAR Factor 3. Failure to do so may be at the agency's peril. Stated differently, the absence of any evidence concerning CAR Factor 3 may very well cause the agency to prove its case overall. As this court is aware, there were three other applicants for the November 2015 cancellation. Presumably, the DBA had the names and employment history of those applicants, meaning there was evidence to be presented on those applicants, more specifically their qualifications and potential whistleblower statuses. Thus, based on Whitmore, the DBA was required to present it, and by not doing so, that should have been to their peril. I'm a little confused by your emphasis on this CAR Factor 3. The AHA says neither party adduced any evidence as to those applicants' qualifications or status as whistleblowers or non-whistleblowers. So did you put in a request that had to do with evidence surrounding these individuals? And if not, what are you saying the AHA should have done? In the absence of anybody putting forward any evidence, this should weigh against the agency? Absolutely, Your Honor. This is what was found in Whitmore and Miller, because it is the agency's burden of proof. Once the framework shifts to the agency, it is no longer the petitioner's or the appellant's burden of proof to put forward evidence. It is the agency's burden of proof to put forward evidence to the three CAR Factors, not the petitioner. And the reason being, Congress stated that the agency, the government, is in the position that has most of the CARs. They're in control of the documents supporting the decision, the testimony of the witnesses. They're in control of who participated in the decision and the records that could document whether similarly personnel actions have been taken in other cases. Counsel, a problem with your argument is that what the agency found does benefit you, and here's why. The government has the burden of proving by clear and convincing evidence. So if the agency concludes no evidence on the third factor renders it neutral, that is to the government's disadvantage because they have the burden of proving by clear and convincing evidence. And if the evidence is ultimately inequitable, they lose and you win. So the problem with your argument is that you don't want it to be found neutral, the absence of evidence. You want it to be found in your favor. I don't agree. It's already in your favor simply by virtue of being neutral because they have the burden. So I don't understand this argument, and we're pretty much out of time. Unless anybody has any other questions. If you want to respond, go ahead, but quickly, go ahead and respond. Yes. So the reason that I don't believe that the AJ was correct in his decision concerning it being neutral is that the petitioner did testify about three similarly individuals within the Phoenix VA that the agency treated differently. They were similarly situated and were not whistleblowers, and she testified to those three individuals, Mr. Gregory Crenshaw, Ms. Lisa Lockridge, and Ms. Ann Wilford, who was the selectee for the chief nurse physician. She testified to those individuals being similarly situated, and the agency put forth no evidence to rebut her testimony. Therefore, it can't be neutral because she presented. It can't be neutral. The agency responded, or the AJ found out, I don't remember which, that there was no evidence about the qualifications of those three persons or whether they were, in fact, whistleblowers or not. So it doesn't actually inform. You didn't put forth evidence of similarly situated people. You just put forth evidence of random people without the details to allow anyone to make a factual conclusion about whether they were similarly situated. Understood. Well, I will conclude with this. I ask this court to do the same as this court did in Miller, which is find that the agency did not meet the clear and convincing evidence, burden of proof, vacate the board's decision, which found the opposite, reverse and remand this case with a ruling in favor of the petitioner, including the termination of remedies consistent with that decided in Beccanubio. Thank you. Okay. I thank both counsel. And this case is taken under submission.